IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ELIZABETH FIREY, | § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. |
| WILLIAMSON COUNTY, C. PANIAGUA, J. CANDLER, B. ELLIOTT, J. BANKS, M. GALVAN, DIANNA O'BRIEN, CHRISTINA ROSS, CHELSEA STEPHENSON, LUCY VAUGHAN, JOSE ARREOLA and WILLIAM RIGNEY | § § § § § § § § | 1:20-CV-00836-LY |
| Defendants. | § | |

**PLAINTIFF'S AMENDED COMPLAINT**

Plaintiff ELIZABETH FIREY files this lawsuit against Defendant WILLIAMSON COUNTY, C. PANIAGUA, J. CANDLER, B. ELLIOTT, J. BANKS, DIANNA O'BRIEN, CHRISTINA ROSS, CHELSEA STEPHENSON, LUCY VAUGHAN, and WILLIAM RIGNEY, and will show:

**I.
PARTIES**

1.      Plaintiff ELIZABTH FIREY is a citizen of Texas and resides in the Western District of Texas in Cedar Park, Williamson County, Texas.

2.      Defendant WILLIAMSON COUNTY is a governmental entity in Texas. It may be served through its County Judge, Bill Gravell, Jr., at 710 S Main St #101, Georgetown, TX 78626. *Service is hereby requested at this time.*

3.      Williamson County's sheriff, Robert Chody, was, at all relevant times, the

policymaker for the County in all matters related to the jail.

4. C. Paniagua was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. He can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

5. J. Candler was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. She can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

6. M. Galvan was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. She can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

7. B. Elliott was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. He can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

8. J. Banks was a "medic" at the Williamson County Jail, and acting under color of law at all relevant times. She can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

9. Dianna O'Brien was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. She can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

10. Christina Ross was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. She can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

11. Chelsea Stephenson was a jailer at the Williamson County Jail, and acting under

color of law at all relevant times. She can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

12. Lucy Vaughan C. was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. She can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

13. Jose Arreola was a "medic" at the Williamson County Jail, and acting under color of law at all relevant times. He can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

14. William Rigney was a jailer at the Williamson County Jail, and acting under color of law at all relevant times. He can be served with process at the Williamson County Jail, 306 W. 4th St., Georgetown, TX 78626.

## II.
## JURISDICTION AND VENUE

15. As this case is brought pursuant to 42 U.S.C § 1983 and the Americans with Disabilities Act, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

16. This Court has jurisdiction over Defendants as they reside in the Western District of Texas.

17. This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct by Defendants that caused injury to Firey in Williamson County, Texas, which is within the Western District of Texas.

18. Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Williamson County, which is within the Western District of Texas.

19. This Court has jurisdiction over Plaintiff's alternative supplemental state law claims pursuant to 28 U.S.C. § 1367.

## III.
## FACTS

20. Firey is a small, slight, 20-year-old woman, who stood approximately 5 feet 7 inches tall, and weighed approximately 120 pounds.

21. Firey was arrested by the Georgetown Police Department after allegedly causing a disturbance. The charges related to this incident were later dismissed.

22. Firey suffers from serious mental health disabilities, including bipolar disorder, depression, social anxiety, and post-traumatic stress disorder. Firey's mental disabilities, when uncontrolled by medication, substantially impair her ability to think, communicate, and care for herself. At the time Firey was allegedly causing the disturbance that resulted in her arrest, it was obvious to everyone that she was experiencing a mental health crisis.

23. The Georgetown Police Department officers took Firey to the Williamson County jail, where she was booked in as a pre-trial detainee.

24. While incarcerated at the jail, Firey continued to suffer mental health crises.

25. Firey's continued mental health crisis was obvious to anyone who interacted with her.

26. Rather than provide Firey with appropriate mental health treatment, the County's jailers instead restrained her in the County's "emergency restraint" chair.

27. It is well known that over use of restraint chairs can be dangerous, can cause serious injuries, and must be closely monitored (including monitoring by medical staff when available).

28. The website for the company that sold the restraint chair to the County specifically warns that "detainees should not be left in the [chair] for more than two hours," and that the chair "should **never** be used as a means of punishment" (emphasis in original).

29. When the jailers used the chair on Firey, they violated both these strict prohibitions.

30. In fact, on September 9, 2018, Defendants restrained Firey in the restraint chair for over eight hours.

31. Beginning around 11:00 am, Firey was allegedly pounding on her cell door. Firey was obviously suffering a serious mental health crisis.

32. Despite Firey's obvious distress, Defendants did nothing to secure mental health care for her.

33. Instead, Defendant Rigney, a sergeant and the supervising officer for the portion of the jail Firey was detained in, ordered jailers to place her in the restraint chair.

34. While the jailers were still assembled outside the cell, they heard Firey begging, "please don't do it," and "I'll be good."

35. Five jailers – Rigney, O'Brien, Ross, Stephenson, and Vaughan – entered Firey's cell. O'Brien was holding a taser and pointing it a Firey.

36. Firey cowered in the corner, holding her jail-issued mattress over herself, begging not to be placed in the restraint chair.

37. The officers took the mattress away, and restrained Firey with handcuffs and leg irons.

38. Three officers – Rigney, Stephenson, and Ross – sat on top of Firey while she begged, "where am I? Where am I?" and screamed in pain.

39. Firey begged, "please don't put me in the chair, it hurts me."

40. Then, to punish Firey for causing a disturbance, Rigney, O'Brien, Ross, Stephenson, and Vaughan, forcefully slammed Firey in the restraint chair.

41. Though he was required to document the reason for placing Firey in the restraint chair, Rigney did not do so – because he was restraining her to punish her for making noise.

42. Firey begged not to be placed in the chair, telling the jailers, "please don't put me in the chair, it hurts me," and "please stop, please stop."

43. As the jailers tightened the restraint straps, Firey complained, telling them, "please stop, I have PTSD," and "ow, it's too tight."

44. After Firey's legs were strapped into the chair, Stephenson forcefully pushed Firey forward, in the back, as Firey screamed in pain.

45. Rigney complained to Firey, "this is three days in a row that you've done this," while Firey explained that she needed to go to the "mental hospital."

46. Firey then told Stephenson, who was restraining her back, "you put that way too tight. You always do."

47. When Firey was fully restrained in the chair, she again told the jailers that the restraints were too tight. None of the officers did anything to check if the restraints were actually too tight, or injuring Firey.

48. Rigney told Firey that the "longer you hoot and holler, the longer you stay in the chair," because "this has been ongoing, every day, so you're going to be in the chair." Rigney stated that she was being restrained for "display of reckless behavior."

49. For the next four hours, Firey remained in the chair – two hours longer than the manufacturer instructed it was safe to use the chair.

50. Indeed, it was Williamson County's policy to restrain detainees in the chair for far longer than the two-hour maximum. Even the "emergency restraint chair checklist" used by the County instructed jailers to use a "new sheet required every four (4) hours."

51. During the six hours Firey spent in the chair, Defendant Arreola, a jail "medic," checked a box indicating her observed her. Upon information and belief, Arreola is not a nurse, or

otherwise qualified to monitor the condition of a person in the restraint chair or determine if they are in distress.

52. Arreola performed a "check" every fifteen minutes – except for an half-hour-long period from 1:15 pm to 1:45 pm.

53. Though the "checklist" suggests that detainees should be "given opportunity to come out" of the restraint chair, Firey was never given this opportunity.

54. Defendant Rigney knew that Firey was restrained in the chair this entire time, and approved restraining her the entire four-hour period.

55. Firey was finally released from the restraint chair around 3:30 pm.

56. Then, around 9:30 at night, Defendants Panigua, Galvan, Candler, Elliott, and Banks put Firey in the restraint chair again.

57. This time Elliott was the supervising officer.

58. Again the officers entered Firey's cell, where she was cowering in the back.

59. Though Firey was in obvious distress, Elliott told her to "stop acting this way."

60. Elliott decided to restrain Firey because she was "kicking and banging," but did nothing to try to secure medical assistance for her.

61. In fact, Firey barely appeared conscious as the officers prepared to strap her into the restraint chair, and could barely sit up without assistance.

62. This time, Firey was completely compliant as the officers prepared to restrain her.

63. Despite Firey's obvious distress, Banks told her "there is nothing wrong with you, you're going to be placed in the emergency restraint chair."

64. Jailers Elliott, Galvan, Banks, Candler, strap Firey into the restraint chair to punish her.

65. Firey tells these officers that the straps are too tight.

66. One of the jailers tells Firey, "your reckless actions are what got you into the restraint chair," because they were punishing her.

67. Firey remained in the restraint chair until almost 1:30 am, another four-hour period.

68. The restraints the officers applied to Firey caused her to suffer serious physical injuries, including fractures to three vertebrae in her back.

69. When Firey would see a jailer, she complained that the restraints were too tight, that she was in physical pain, and that she was strapped into the chair in a position that was injuring her back. Nonetheless, the jailers did not loosen the restraints to prevent the chair from injuring Firey.

70. After being incarcerated without mental health treatment for several days, Firey's family secured her release from jail so that she could be admitted into an inpatient psychiatric facility the day after her release from jail. Shortly before admission to the psychiatric facility, the severe injuries to Firey's back caused by the improper and negligent use of the restraint chair were discovered.

71. Williamson County intentionally discriminated against Firey due to her mental disabilities by failing to accommodate her need for mental health treatment, intentionally denying her mental health treatment, and, instead of treating her, punishing her by cruelly restraining her in the restraint chair without proper observation until she suffered serious injuries to her back.

72. On information and belief, Williamson County did not train its jailers on how to properly restrain an individual, or how to address complaints that restraints are too tight, even though it is highly foreseeable to that jailers would routinely be required to do so, and that citizens (like Firey) would be injured as a result. Indeed, the restraint chair's instructions specifically

informed the County that "use of [the chair] without first reading and thoroughly understanding the instructions could cause injury or death."

73. Moreover, Williamson County's deputies had a policy and/or practice of regularly restraining people too tightly, regularly leaving people strapped into the "emergency restraint chair" without reasonable cause, punishing people suffering mental health crises by placing them in the restraint chair, and regularly unjustifiably injuring people in Firey's position as a result.

74. Restraint chairs are known to be extremely dangerous and prone to misuse.

75. In fact, Williamson County has been sued on several occasions due to its routine overuse of the restraint chair. According to one lawsuit, Daniel McCoy allegedly died from Williamson County's misuse of the device.

76. Upon information and belief, one or more of the individual Defendants also used excessive force against Firey by placing her in the restraint chair on occasions prior to the ones described in this complaint.

## IV.
## CLAIMS

### A. AMERICANS WITH DISABILITIES ACT
### (Against Defendant Williamson County Only)

24. Plaintiff incorporates by reference all of the foregoing, and alleges as follows:

28. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

29. Title II of the requires public entities, like the County, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are

otherwise qualified.

30. Confinement in a jail is a program and service provided by Williamson County for ADA purposes. Here, Williamson County was incarcerating Firey as a pre-trial detainee.

31. Jails also provide services like medical and mental health care to detainees, like Firey.

32. Firey is a qualified individual with a disability within the meaning of the ADA in that she has mental impairments that substantially limit one or more major life activities – here, the operation of her brain, and substantial limitations on her ability to think, concentrate, and care for herself, due to her depression, bipolar disorder, anxiety disorder, and post-traumatic stress disorder.

33. The County violated Title II of the ADA by failing to provide Firey the reasonable accommodations that were needed and available to allow Firey to receive the benefits of the County's programs and services. The County's jailers should have accommodated Firey by:

- Providing her appropriate mental health care during her incarceration;
- Restraining her more than two hours at a time; and,
- If she required being restrained, ensuring she was restrained humanely by constantly observing her, frequently checking the restraints, and loosening them when she complained of pain.

25. Failure to provide these reasonable accommodations was intentional discrimination under the ADA, entitling Plaintiff to compensatory relief.

26. Moreover, jailers intentionally discriminated against Firey by punishing her for suffering a mental health crisis by restraining her in the restraint chair, and failing to loosen the straps when she complained the chair was injuring her.

27. Intentionally discriminating against Firey by punishing her with placement in the restraint chair is illegal discrimination under the ADA, and this illegal discrimination entitles Firey to compensatory relief.

## B. 42 U.S.C. § 1983 *MONELL* CLAIM—FOURTH AND FOURTEENTH AMENDMENTS
(Against Defendant Williamson County Only)

28. Plaintiff incorporates by reference all of the foregoing, and alleges as follows:

29. Williamson County had the following policies and/or practices in place when Defendants injured Firey:

- Ignoring complaints by detainees that restraints are too tight;
- Routine use of the emergency restraint chair in situations where it is not necessary;
- Failing to train officers about the possibility of severe injury caused by restraints and the emergency restraint chair;
- Using the emergency restraint chair to punish detainees suffering from mental health crises;
- Using the emergency restraint chair as an alternative to providing detainees suffering mental health crises with actual mental health care;
- Failing to train officer to release or loosen restraints when a detainee complains; and,
- Failing to train officers on alternative restraint techniques to restraint chairs.

30. Moreover, Williamson County ratified the jailers use of excessive force against Plaintiff by investigating the incident, affirming the jailers' misconduct, and continuing to approve this form of excess force despite knowing it caused serious injury to Firey and others.

31. On information and belief, the sole policymaker for the activities of law enforcement in the Williamson County Jail at all relevant times was the Williamson County Sheriff, Robert Chody.

32. Each of the policies delineated above were actually known, constructively known, and/or ratified by Williamson County and its policymakers—including the Sheriff—and were promulgated with deliberate indifference to Plaintiff's rights under the United States Constitution.

33. The known and obvious consequences of these policies and practices was that Williamson County deputies would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

### C.  FOURTEENTH AMENDMENT EXCESSIVE FORCE
### (Against Defendants Paniagua, Galvan, Candler, Elliott, Banks, O'Brien, Ross, Stephenson, Rigney, and Vaughan)

34. Plaintiff incorporates by reference all of the foregoing, and alleges as follows:

35. Defendants Paniagua, Galvan, Candler, Elliott, Banks, O'Brien, Ross, Stephenson, Rigney, and Vaughan each used excessive force against Firey by unnecessarily restraining her in the restraint chair for long periods of time, against the explicit instructions of the chair's manufacturer.

36. The force Paniagua, Galvan, Candler, Elliott, Banks, O'Brien, Ross, Stephenson, Rigney, and Vaughan purposely or knowingly used against Firey was objectively unreasonable given the need. Defendants intended to place Firey in the restraint chair, intended to fasten her into the chair too tightly (despite her complaints), and intended to leave her in the chair for hours longer than the manufacturer instructed was safe.

37. Once Firey was restrained in the restraint chair, the jailers made no attempt to temper their force, or limit the amount of time she was forcibly restrained.

38. At no time was Firey a danger to anyone other than herself, and no reasonable officer could have perceived her to pose any serious threat to the security of the jail.

39. Firey never significantly resisted the officers as they held her down, and strapped her into the restraint chair to punish her for suffering a severe mental health crisis.

40. As a result of the force Defendants used against Firey, she suffered injuries.

41. In the alternative, to the extent that any of the individual defendants did not use excessive force against Firey, they were each bystanders who knew that fellow officers were violating Firey's constitutional rights, had a reasonable opportunity to prevent the constitutional violations, but chose not to act.

### D. IN THE ALTERNATIVE, TEXAS TORT CLAIMS ACT NEGLIGENCE
### (Against Defendant Williamson County Only)

42. Plaintiff incorporates by reference all of the foregoing, and alleges as follows:

43. Defendant Williamson County is a governmental unit subject to the Texas Tort Claims Act, Texas Civil Practice and Remedies Code § 101.021. Williamson County owned, controlled, and possessed the emergency restraint chair.

44. Alternatively, Defendants negligently used the emergency restraint chair—tangible personal property—and that negligence proximately caused serious injuries to Firey.

45. The jailers were employees of Williamson County and acted in the course of their employment at all relevant times.

46. Williamson County proximately caused the injuries to Firey through the dangerous use of the emergency restraint chair. Williamson County had actual knowledge that the use of the emergency restraint chair posed a danger to detainees, including Firey.

47. No exception to the waiver of Williamson County's immunity apply. If Williamson County were a private person, it would be liable as a private entity for premises liability and/or negligence relating to its employees' negligent use of the dangerous emergency restraint chair.

48. Plaintiff provided notice to Williamson County of her claims as required by the Texas Tort Claims Act, and satisfied any other conditions precedent. Further, Plaintiff's claim was obvious and known to Williamson County immediately after Firey suffered serious injuries,

providing actual notice to Williamson County.

## V.
## DAMAGES

49. Plaintiff Firey, suffered and claims the following damages as a proximate result of Defendant's acts and omissions:

- past and future physical pain and suffering

- past and future mental anguish;

- past and future disfigurement;

- past and future impairment;

- past and future medical expenses;

- past and future loss of earning capacity; and

- attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205.

## VI.
## JURY DEMAND

50. Plaintiff respectfully requests jury trial pursuant to FED. R. CIV. P. 48.

## VIII.
## PRAYER FOR RELIEF

51. Accordingly, Plaintiff asks that judgment be awarded against Defendant for

   1) Compensatory damages;

   2) Punitive damages against the individual defendants only;

   3) Attorneys' fees, including reasonable and necessary expenses including expert fees, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205;

   4) Costs of court;

   5) Pre-judgment and post-judgment interest at the highest rate allowable under the law; and

6) All other relief to which Plaintiff is justly entitled.

Respectfully submitted,

**EDWARDS LAW**

1101 East 11th Street
Tel.  512-623-7727
Fax.  512-623-7729

By   /s/ Jeff Edwards
     JEFF EDWARDS
     State Bar No. 24014406
     jeff@edwards-law.com
     SCOTT MEDLOCK
     State Bar No. 24044783
     scott@edwards-law.com
     DAVID JAMES
     State Bar No. 24092572
     david@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify by my signature below that a copy of this document has been served on counsel for the Defendants, via the Court's electronic filing system.

     /s/ Jeff Edwards
     JEFF EDWARDS